Sills Cummis & Gross P.C.
Attorneys for the Plaintiff
30 Rockefeller Plaza, 29th Floor
New York, New York 10112
(212) 643-7000
Jay L. Silverberg
Lori K. Sapir

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                                  Chapter 11

DNL INDUSTRIES, LLC,                                             Case No. 13-22079 (RDD)

                            Debtor.
-----------------------------------------------------------x
DNL INDUSTRIES, LLC,
                                                                                     Adv. Pro. No. 13- _____
                            Plaintiff,

          v.

TEN MEDIA LLC,

                            Defendant.
-----------------------------------------------------------x

## ADVERSARY COMPLAINT SEEKING DECLARATORY JUDGMENT

Plaintiff DNL Industries, LLC ("DNL"), by its attorneys Sills Cummis & Gross P.C., for its complaint (the "Complaint") against TEN Media LLC ("TEN Media"), alleges as follows:

### PRELIMINARY STATEMENT[1]

1.  As TEN Media has repeatedly admitted in word and deed, DNL is the owner of the SEP Suite software program, and TEN Media is a mere licensee. From the day it commenced this chapter 11 case, DNL has stated its intention to sell SEP Suite and its patent

---

[1] Capitalized terms not defined in this Preliminary Statement have the meaning ascribed to them herein.

2353250 v1

portfolio to generate cash to pay creditors. *See* Affidavit of Roger D. Timpson Pursuant to Local Bankruptcy Rule 1007-2 (the "Timpson Affidavit") [Docket No. 3] ¶ 29. TEN Media initially agreed with that strategy, but beginning this summer it invented a literally incredible claim to own SEP Suite, and is now using every possible stratagem and device to cripple DNL's sale. TEN Media's specious claim is refuted by its actions and the documentary evidence in which it acknowledged DNL's ownership of SEP Suite on numerous occasions. It's now past time to put an end to this dishonest campaign that threatens DNL's reorganization. DNL brings this action to clear title to SEP Suite.

## JURISDICTION AND VENUE

2. This adversary proceeding arises in and is related to DNL's above-captioned chapter 11 case, which is pending in this Court.

3. This action is brought as an adversary proceeding pursuant to Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and pursuant to 28 U.S.C. § 2201, *et seq.*

5. This Court has personal jurisdiction over TEN Media pursuant to Bankruptcy Rule 7004(f).

6. This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

7. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## PARTIES

8. DNL is a limited liability company, organized under the laws of the State of New York.

9. TEN Media is a limited liability company, organized under the laws of the State of Delaware.

## BACKGROUND

10. Prior to the commencement of its chapter 11 case, DNL was a start-up software and systems company focused on food safety and disease prevention. DNL was developing a collection of software programs, including certain software referred to as Farm Hand and Farm Manager (collectively, "SEP Suite"), that would improve food safety by enhancing the detection and prevention of salmonella, viruses, and bacteria that cause enteritis, and other pathogens. *Indeed, as contemplated by Mitchell Chait as an early investor in DNL, DNL was created for the express purpose of owning and developing SEP Suite.* DNL contracted with various firms, including Axispoint, Inc. ("Axispoint"), an information technology services firm that, among other things, develops software for clients, to develop SEP Suite.

11. Although SEP Suite was being developed by Axispoint for DNL, the product, specifically as applied to eggs and salmonella, was licensed to TEN Media pursuant to that certain SEP Intellectual Property License Agreement dated April 21, 2011 (the "SEP License Agreement") between DNL and TEN Media's predecessor, Eggshell Laser Imaging, LLC. A copy of the SEP License Agreement is annexed hereto as Exhibit "A".

12. As the licensee of SEP Suite from DNL, TEN Media expressly acknowledged that "DNL is the owner of the Licensed Technology," which includes SEP Suite. SEP License Agreement at Recitals and § 1.7. Notwithstanding this admission and others, TEN Media now claims that it owns SEP Suite, flatly contradicting the SEP License Agreement and the other documents in which it acknowledged DNL's ownership. But TEN Media's actions also belie its ownership claim: *after* the date of the SEP License Agreement, TEN Media paid DNL

millions of dollars to develop SEP Suite and acquire a license to it, which is totally inconsistent with its manufactured claim of ownership.

13. In order to resolve the issue of ownership of SEP Suite, DNL brings this action seeking a declaratory judgment, pursuant to the Federal Declaratory Judgment Act (28 U.S.C. § 2201, *et seq.*) that DNL is the exclusive owner of SEP Suite.

## FACTUAL ALLEGATIONS

### TEN Media's Eggshell Laser Imaging Project

14. Prior to the development and license of SEP Suite, TEN Media had a business relationship with Axispoint, pursuant to which TEN Media hired Axispoint to develop a software program that would control laser printers to mark individual eggs using laser ink for the purposes of displaying health and safety data, such as freshness dating, grading, tracing and, potentially, advertising (the "Eggshell Project").[2]

15. Axispoint developed the Eggshell Project in various stages from November 2009 to May 2011, by which time it was substantially completed, and a final product with instructions was delivered to TEN Media in October 2011. The software developed for the Eggshell Project is distinct from SEP Suite. The initial contract between TEN Media and Axispoint for the Eggshell Project was the Independent Contractor Agreement dated November 20, 2009 (the "ICA"). The ICA was originally between NewMarket Impressions LLC, doing business as EggFusion ("NMI") and Axispoint, and was amended on May 31, 2011 to substitute TEN Media for NMI when TEN Media became a successor in interest to NMI and acquired certain assets of NMI, including the ICA.

---

[2] The "TEN" in TEN Media is an acronym for "The Egg Network," so it is no surprise that TEN Media was in the egg business.

**DNL's Development & License of SEP Suite**

16. Creating the Eggshell Project was one element of TEN Media's strategy of bringing technological improvements to the commercial egg industry. To achieve that goal, TEN Media sought to (i) develop software for use in management systems to aid in the prevention of food borne disease in eggs (i.e., SEP Suite), (ii) use laser technology to mark eggs (i.e., the Eggshell Project), and (iii) provide traceability services to marked eggs. *See* Second Amended and Restated Limited Liability Company Agreement of TEN Media, LLC § 1.4.

17. As Axispoint was making substantial progress in completing the Eggshell Project, TEN Media approached DNL to develop software relating to the detection and prevention of food borne disease specifically in eggs. Rather than develop the software internally, TEN Media decided to contract the software development through DNL and then obtain a license for the software. TEN Media was interested only in the application of SEP Suite specifically to eggs, and thus the decision to obtain an exclusive license of SEP Suite solely for eggs would require less of an economic investment than owning and developing SEP Suite for its broader applications. DNL, on the other hand, was formed to develop software for food safety and disease prevention in all food industries and for all food borne diseases. Development of SEP Suite for eggs to be licensed to TEN Media would provide a jumping-off point from which DNL could adapt SEP Suite to other food industries and other types of food borne diseases.

18. DNL, however, was a "virtual company" that lacked the ability to create and develop the software for SEP Suite. Accordingly, DNL subcontracted the development of SEP Suite to Axispoint under a Master Service Agreement dated January 1, 2011 (the "DNL/Axispoint MSA"), a copy of which is annexed hereto as Exhibit "B". Under the DNL/Axispoint MSA, Axispoint provided general consulting and software services to develop SEP Suite for the benefit of DNL, as the owner of the intellectual property related to SEP Suite.

5

All of the work performed by Axispoint for SEP Suite was governed by SOWs under the DNL/Axispoint MSA, except for a January 20, 2011 SOW and a March 9, 2011 SOW prepared pursuant to the TEN Media/Axispoint ICA governing the Eggshell Project.

19. The January 20, 2011 SOW encompassed some preliminary consulting work by Axispoint to consider, very broadly, how SEP Suite functionality could be implemented. No code was ever written by Axispoint under this SOW, and only approximately $35,000 was paid under that SOW. The March 9, 2011 SOW, which refers to a beta version of SEP Suite, was incorrectly issued and replaced by a nearly identical SOW between DNL and Axispoint. Axispoint never invoiced TEN Media for work performed under the March 9, 2011 SOW, and Axispoint was paid for that work by DNL and not by TEN Media.

20. The confusion regarding the appropriate parties for whom work was being done was addressed by Marco Hegyi, an officer of TEN Media, in a June 16, 2011 email to individuals working on the Eggshell Project and SEP Suite, including representatives of DNL and of Axispoint. The June 16, 2011 email from March Hegyi is annexed hereto as <u>Exhibit "C"</u>. In that email, Hegyi clarifies that DNL would handle delivery of SEP Suite through Axispoint because DNL owned SEP Suite: "As for SEP, Scott Smith is the requirements owner, however, ***since DNL is the ultimate IP owner, it is my understanding that Joe*** [referring to Joseph Pianelli, the COO of DNL at the time] ***that he is driving the delivery via Axispoint.***" June 16, 2011 email (emphasis added).

21. All of the work Axispoint performed for DNL in connection with SEP Suite was unrelated to the work Axispoint performed for TEN Media in connection with the Eggshell Project, because the two projects were entirely independent in all material respects.

22. TEN Media obtained its exclusive license to use SEP Suite pursuant to the SEP License Agreement dated April 21, 2011 between DNL and TEN Media (then known as Eggshell Laser Imaging, LLC). The recitals in the SEP License Agreement provide that:

A. ***DNL is the owner of the Licensed Technology*** (as hereafter defined);

B. ELI [Eggshell Laser Imaging, n/k/a TEN Media] holds certain patents pertaining to the tracking, tracing and marking of eggs and desires to obtain a license to the Licensed Technology (as hereinafter defined) in conjunction with the business of ELI, on an exclusive basis throughout the world; and

C. DNL desires to grant such license to ELI under the terms and conditions specified herein.

SEP License Agreement, recital clauses (emphasis added).

23. "Licensed Technology" is defined as "all Copyright Material, all Licensed Patents, if any, and the proprietary technology, systems and processes, developed and/or owned by DNL, in its current state, or as enhanced over time, as the case may be, which is designed to aid in the prevention of Salmonella Enteritidis ('SE') infection of shell eggs, during shell egg production, storage, and transportation (a.k.a. Sep Suite)." *Id.* at § 1.7. Accordingly, TEN Media has expressly acknowledged that DNL owns SEP Suite.

24. The SEP License Agreement further provides, in the section entitled "Ownership," that "DNL represents and warrants that to its knowledge (a) ***it owns all right, title and interest in and to the Licensed Technology and the Copyright Material***, (b) it is not violating any agreements with any other entity by entering into this Agreement; and (c) the use of the Licensed Technology by ELI or Sub-Licensees in the manner authorized by this Agreement will not violate the rights of any other entity. ***Each Party shall not contest the above rights***, and, upon the reasonable request and expense of the other Party, take all reasonable actions to establish and perfect the same." SEP License Agreement § 2.6 (emphasis added).

25.    The SEP License Agreement was executed by Mitchell Chait as President of TEN Media, and by Daniel DiSano as President and CEO of DNL. When the SEP License Agreement was executed, TEN Media paid the first year's license fee of $20,000 at that time. As part of the development process, DNL and TEN Media also entered into a Master Services Agreement dated May 1, 2011 (the "TEN Media/DNL MSA") and related Statements of Work (each a "SOW"), pursuant to which DNL agreed to perform certain information technology services and provide various equipment and software products to TEN Media. A copy of the TEN Media/DNL MSA and related SOWs are annexed hereto as Exhibit "D". The TEN Media/DNL MSA refers to the SEP License Agreement and the parties' rights and obligations thereunder. *See e.g.*, TEN Media/DNL MSA §§ 3(b), 7(a) and 8(a). The Statements of Work dated November 1, 2011 and February 1, 2012 that were prepared pursuant to the TEN Media/DNL MSA include the following language: "***SEP Suite software, which includes SEP Suite Farm Manager and Mobile Farm Hand, was developed by and is owned by DNL***. DNL has provided a license to TEN per its agreement dated April 21, 2011." Nov. 1, 2011 and Feb. 1, 2012 SOWs, p. 1 (emphasis added). TEN Media never disputed the statements in the SOWs that DNL owned SEP Suite.

26.    For services performed and products delivered under the TEN Media/DNL MSA and related SOWs, DNL received from TEN Media $2,940,000 from December 2011 through June 2012, well after the parties entered into the SEP License Agreement and the TEN Media/DNL MSA.

27.    To recap, TEN Media was a party to at least four agreements stating that DNL was the owner of SEP Suite and paid DNL nearly $3 million pursuant to those agreements, all without even a whisper that it owned SEP Suite.

**The Chapter 11 Case**

28.     On January 22, 2013, DNL filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 case.

29.     As set forth in the Timpson Affidavit, DNL intended from the outset to use its chapter 11 case to attempt to maximize the value of its assets through a sale of, among other things, SEP Suite.  *See* Timpson Aff. ¶ 29.  Accordingly, early in its chapter 11 case, DNL sought approval to retain SSG Advisors, LLC as DNL's investment banker to oversee a sale process for substantially all of DNL's assets.  On April 15, 2013, DNL filed a motion (the "Sale Motion") [Docket No. 49] to approve the sale of substantially all of DNL's assets, including the SEP Suite program and related intellectual property assets (the "Sale"), and bidding procedures in connection therewith.

30.     On May 28, 2013, TEN Media filed an objection [Docket No. 58] to the Sale Motion, on the following grounds: (i) any assumption of the SEP License Agreement and TEN Media/DNL MSA would not be possible because DNL would not be able to cure defaults or provide adequate assurance of future performance thereunder, (ii) the Sale would be subject to the rights of TEN Media under section 365(n) as a licensee, and (iii) vague and general assertions regarding TEN Media's potential ownership interest in certain of the intellectual property assets to be sold.  Following discussions with DNL's counsel, TEN Media's counsel agreed to withdraw its objection to the bid procedures, and to the Sale in principle, and work with DNL on an informal basis to resolve any ownership issues.  DNL also agreed to include protective language in the bid procedures order that was provided by TEN Media.

31.     At the July 10, 2013 hearing on approval of bid procedures in connection with the Sale, the Court referred the potential issue that arose with respect to TEN Media's assertion of ownership, and told the parties that the ownership issue may not be resolved prior to

the completion of the Sale.[3] DNL and the Court understood TEN Media to be reserving its rights, but that TEN Media agreed to have the Sale go forward with a reservation of its rights to the proceeds of the Sale. On July 12, 2013, the Court entered an order [Docket No. 79] approving bid procedures in connection with the Sale. The Sale is to occur by auction on October 25, 2013, and a hearing on the Sale is scheduled for November 5, 2013.

32.     On July 12, 2013, DNL filed a motion (the "9019 Motion") to approve a settlement with Axispoint under Rule 9019, pursuant to which, among other things, Axispoint would stipulate that DNL is the sole owner of, and turnover to DNL, all intellectual property related to SEP Suite, including the source code, and all patents, copyrights, trade secrets, trademarks and other intellectual property rights. Pursuant to the settlement, Axispoint would prepare a demonstration of the SEP Suite program in furtherance of the Sale. Counsel for TEN Media initially expressed to counsel for DNL that TEN Media would not object to the settlement with Axispoint, but would reserve its rights with respect to ownership.

33.     But a week before the scheduled August 1, 2013 hearing on the 9019 Motion, counsel for TEN Media informed DNL that TEN Media had recently "discovered" documents that purported to establish TEN Media's ownership of SEP Suite. Rather than reserving its rights as it previously agreed, TEN Media insisted that the ownership issue be litigated immediately and that it would not consent to the Sale until ownership was adjudicated. Accordingly, the 9019 Hearing scheduled for August 1, 2013 was converted to a status conference. At the August 1 hearing the Court stated that the Sale would not go forward and the bid procedures order would be vacated in light of TEN Media's changed position. *See* Transcript

---

[3] "THE COURT: I just want to plant a seed. Is that issue may not ultimately get resolved before the sale and it's a variation on credit bidding. I think your client should be prepared to have the cash. Later you might get it back if it's determined that you own the property." Counsel for TEN Media acknowledged her understanding that that was the case. *See* Transcript of July 10, 2013 Hearing, the relevant portions of which are annexed hereto as Exhibit "E".

of August 1, 2013 Hearing at 18, the relevant portions of which are annexed hereto as <u>Exhibit "F"</u>.

36. After the August 1 hearing, following discussions between counsel, DNL and TEN Media agreed to engage in an informal process to resolve any ownership issue in parallel with the Sale process, and informed the Court of their agreement at an August 9, 2013 conference call with Court. On that call, TEN Media's counsel told the Court that TEN Media would withdraw its objection to the 9019 Motion and again consent to the Sale going forward, consistent with its original reservation of rights. In light of these acknowledgments, the Court agreed to withhold from vacating the bid procedures order, and scheduled a hearing on the 9019 Motion for September 24, 2013.

35. But two business days before the scheduled hearing on the 9019 Motion, TEN Media *again* changed its position and informed the Court that it wished to revive its objection to the 9019 Motion, and insisted upon an immediate litigation of the ownership question. At the September 24, 2013 hearing, the Court refused to allow TEN Media to renew its objection on the grounds of estoppel.

36. On September 30, 2013, the Court entered an order [Adv. Pro. No. 13-08225-shl; Docket No. 16] approving the Debtor's settlement with Axispoint. Axispoint has prepared and delivered to DNL a demonstration of the SEP Suite program.

**<u>TEN Media's Ownership Claim</u>**

37. Notwithstanding the clear statements in the SEP License Agreement and the SOWs, and TEN Media's payments to DNL under those agreements, TEN Media nonetheless now asserts it owns SEP Suite. TEN Media's theory of ownership is unsupportable. TEN Media asserts that TEN Media owns SEP Suite because that asset was purportedly transferred to it from NMI under a Contribution and Assumption Agreement dated April 26,

2011 (the "Contribution Agreement") between TEN Media and NMI. On July 29, 2013, TEN Media filed the Declaration of Justin Brown (the "Brown Declaration") [Docket No. 94] in support of TEN Media's objection to the 9019 Motion, which revealed the existence of the Contribution Agreement and asserted, for the first time, TEN Media's claim of ownership. Mr. Brown is TEN Media's general counsel and was general counsel to NMI since December 2009. Accordingly, Mr. Brown was general counsel to NMI or TEN Media at all times relevant to this adversary proceeding and surely knew, or should have known, about the existence of the Contribution Agreement and the SEP License Agreement. This new claim by TEN Media, as set forth in the Brown Declaration, clearly contradicts TEN Media's repeated acknowledgments of DNL's ownership of SEP Suite and its own promise not to contest such ownership.

        38.    This Court expressed deep skepticism about the suspicious timing of this revelation and the putative ownership claim emanating from the Contribution Agreement: "THE COURT: [Y]ou appreciate the affiant who says that they just found this stuff [referring to Justin Brown and the Contribution Agreement] was the general counsel for the assignor seamlessly between 2009 and the transfer in 2011, the same time--basically the same month, April and May--that it was assigned to TEN Media, that there was an agreement by Axispoint, and there was a contract with the debtor. So this was just, like, under the bed? … And it paid three million dollars in the meantime?" Transcript of August 1, 2013 Hearing p. 16. The Court then asked the logical question "The first question, of course, is what were they spending the three million dollars for that they spent, and why did they feel they had to enter into that new arrangement, notwithstanding they owned everything." *Id.* at 18. The relevant portions of the Transcript of the August 1, 2013 Hearing is annexed hereto as Exhibit "F". The Court's disbelief is clear, and so is the reason why: TEN Media's story makes no sense.

39. The Contribution Agreement was entered into five days *after* the SEP License Agreement, in which DNL's ownership of SEP Suite was acknowledged by TEN Media. Both the Contribution Agreement and the SEP License Agreement were signed by Mitchell Chait, as President of TEN Media. TEN Media, through Mr. Chait, was aware that DNL owned SEP Suite (as acknowledged by TEN Media in the earlier SEP License Agreement) when NMI purported to transfer SEP Suite (an asset NMI never owned) to TEN Media under the Contribution Agreement. Indeed, TEN Media paid to DNL almost $3 million under the TEN Media's agreements with DNL, all *after* the Contribution Agreement was executed. The SEP License Agreement would be wholly unnecessary if TEN Media owned SEP Suite. Finally, if indeed DNL owns SEP Suite, the purported transfer of SEP Suite pursuant to the Contribution Agreement is a nullity, no more effective than the proverbial sale of the Brooklyn Bridge.

40. It is clear that TEN Media's ownership claim is intended to disrupt and derail DNL's reorganization efforts. Recognizing that the Sale of DNL's assets, including primarily SEP Suite, is critical to DNL's chapter 11 case, TEN Media has engaged in a campaign to torpedo the Sale at every turn. TEN Media's ownership claim is thus asserted in bad faith.

## FIRST CLAIM FOR RELIEF

### (For Declaration, Pursuant to 28 U.S.C. § 2201, That DNL Is The Exclusive Owner Of SEP Suite)

41. DNL incorporates by reference the allegations of Paragraphs 1 through 40 of the Complaint as if fully set forth herein.

42. By the express terms of the SEP License Agreement, the TEN Media ICA and related SOWs, DNL is the owner of the SEP Suite and TEN Media has acknowledged DNL's ownership of SEP Suite.

43. TEN Media never acquired, and does not now hold, an ownership interest in the SEP Suite. NMI could not transfer SEP Suite to TEN Media under the Contribution Agreement because NMI did not own SEP Suite.

**WHEREFORE,** DNL prays that this Court enter a judgment, pursuant to the Federal Declaratory Judgment Act (28 U.S.C. § 2201, *et seq.*), declaring that DNL is the exclusive owner of SEP Suite, and for such other and further relief as the Court deems just and appropriate.

Dated: October 17, 2013
      New York, New York

                              **SILLS CUMMIS & GROSS P.C.**
                              Attorneys for DNL Industries, LLC

                              By:   */s/ Lori K. Sapir*
                                       Jay L. Silverberg
                                       Lori K. Sapir
                              30 Rockefeller Plaza, 29th Floor
                              New York, New York